## Commonwealth ex rel. Schnader *v.* Liveright, Secretary of Welfare et al.

36

38

40

42

Argued March 11, 1927. Before Frazer, C. J., Simpson, Kephart, Schaffer, Maxey, Drew and Linn, JJ.

44

48

*Wm. A. Schnader,* Attorney General, with him *Lucien B. Carpenter,* Assistant Deputy Attorney General, and *Herman J. Goldberg,* Deputy Attorney General, for appellants.—Where ordinary words are used in the Constitution, they must be construed in their popular and general sense, as the people who voted for it would understand them: Hoffman v. Kline, 300 Pa. 485; Collins v. Kephart, 271 Pa. 428; Perkins v. Phila., 156 Pa. 554.

Section 4 of the act provides that each political subdivision within the State charged by law with the care of the poor "shall have authority under the provisions of this act, any law to the contrary notwithstanding, to expend the moneys received from the appropriation made by this act for the purpose of providing food, clothing, fuel and shelter for residents within their districts who are without means of support."

As defined by the Century Dictionary "authority" means "power or admitted right to command or to act, whether original or delegated:" Lehigh Co. v. Hoffort, 116 Pa. 119; Noecker v. Woods, 259 Pa. 160; Investor's Realty Co. v. Harrisburg, 281 Pa. 200; Com. v. Bearstler, 85 Pa. Superior Ct. 228; Kulp v. Phila., 291 Pa. 413.

Act No. 7-E does not come within any subject designated by the governor in his proclamations convening the special session: Pittsburgh's Petition, 217 Pa. 227;

Hollinger v. King, 282 Pa. 157; Likins's Petition, 223 Pa. 468; Fayette Co. v. Commissioners, 35 Pa. C. C. R. 401; French Creek Bridge, 39 Pa. C. C. R. 67; Stewart Contracting Co. v. Lehigh Co., 22 Pa. Dist. R. 690.

It is true that several of the subjects designated by the governor for the consideration of the legislature were not as broadly stated as they might have been; but it was within the governor's discretion to determine whether the subjects designated should be broadly or narrowly expressed: Stewart Contracting Co. v. Lehigh Co., 22 Pa. Dist. R. 690.

"Unemployment relief" is not the subject of Act No. 7-E.

There is absolutely no authority in Pennsylvania or elsewhere sustaining the position of the lower court.

Act No. 7-E creates a state debt contrary to article IX, section 4, of the Constitution: Com. v. Barnett, 199 Pa. 161; Brooke v. Phila., 162 Pa. 123; McGuire v. Phila., 245 Pa. 287; Schuldice v. Pittsburgh, 251 Pa. 28; McAnulty v. Pittsburgh, 284 Pa. 304; Georges Twp. v. Trust Co., 293 Pa. 364; Hillman Coal & Coke Co. v. Twp., 300 Pa. 108; Keller v. Scranton, 200 Pa. 130; Jackson v. Boro., 280 Pa. 601; Reuting v. Titusville, 175 Pa. 512.

The available current revenues for a given period must be estimated; and the estimates of the proper authorities must be accepted as official: Georges Twp. v. Trust Co., 293 Pa. 364; Athens Nat. Bank v. Twp., 303 Pa. 479; Schuldice v. Pittsburgh, 251 Pa. 28; Elliott v. Phila., 229 Pa. 215; Phila. v. Hadley, 12 Pa. D. & C. 239; Com. v. Barnett, 199 Pa. 161.

The legislature knew that the appropriation made by Act No. 7-E was $10,000,000 beyond the revenues for this biennium. Notwithstanding this knowledge, it made the appropriation without providing any additional revenue or without reducing, by a penny, appropriations pre-

viously made which more than exhausted the total revenue for the biennium.

The provisions of article IX, sections 4 and 8 are mandatory: Hillman Coal & Coke Co. v. Twp., 300 Pa. 108; McAnulty v. Pittsburgh, 284 Pa. 304.

Act No. 7-E would make an appropriation for charitable or benevolent purposes to communities, contrary to article III, section 18, of the Constitution: Com. v. Coal Co., 251 Pa. 134; Collins v. Kephart, 271 Pa. 428; Dulles's Est., 218 Pa. 162; Taylor v. Hoag, 273 Pa. 194; Busser v. Snyder, 282 Pa. 440.

The legislature cannot wipe out specific constitutional limitations of its power by purporting to exercise the police power: White's App., 287 Pa. 259; Com. v. Widovich, 295 Pa. 311; Com. v. Vrooman, 164 Pa. 306; Jackman v. Rosenbaum Co., 263 Pa. 158; Harris v. Board of Optometrical Examiners, 287 Pa. 531.

The title of the act does not indicate that duties are imposed upon county treasurers, county commissioners and courts of common pleas of certain counties, or upon the city treasurer, the department of welfare and the council of Philadelphia. Therefore, the act violates article III, section 3, of the Constitution: Borough of Phœnixville Road, 109 Pa. 44; Phila. v. Market Co., 161 Pa. 522; Quinn v. Cumberland Co., 162 Pa. 55; Com. v. Samuels, 163 Pa. 283; Stegmaier v. Jones, 203 Pa. 47; Dailey v. Potter Co., 203 Pa. 593; Com. v. Kebert, 212 Pa. 289; Provident Life & Trust Co. v. Hammond, 230 Pa. 407; County Commissioners' Petition, 255 Pa. 88; Strain v. Kern, 277 Pa. 209; Guppy v. Moltrup, 281 Pa. 343; Com. v. Boro., 272 Pa. 189; Spector v. Ins. Co., 285 Pa. 464; Phillips's Est., 295 Pa. 349; Roush v. Co., 63 Pa. Superior Ct. 314.

Act No. 7-E is local or special legislation regulating the affairs of counties. It violates article III, section 7, of the Constitution: Frost v. Cherry, 122 Pa. 417; Chalfant v. Edwards, 173 Pa. 246; Chalmers v. Phila., 250

Pa. 251; Com. v. Gumbert, 256 Pa. 531; Division of Sugar Notch Boro., 7 Pa. Superior Ct. 4; Morrison v. Bachert, 112 Pa. 322.

*R. Lawrence Coughlin,* for appellee.—The method of allocation does not make the act defective by reason of an improper classification under our decisions construing what legislation is local and, therefore, unconstitutional: Collins v. Kephart, 271 Pa. 428.

In determining the unconstitutionality of the statute it must be construed in every possible way to sustain it and every presumption must be indulged in its favor: Sinking Fund Cases, 99 U. S. 700; Mugler v. Kansas, 123 U. S. 623; Com. v. Hyneman, 242 Pa. 243.

Act No. 7-E is on a subject of legislation within the proclamations of the governor convening the special session of the legislature as required by article III, section 25, of the Constitution: Likins's Petition, 223 Pa. 468.

The legislature was not bound to follow the method proposed by the governor, for that would be legislation on his part, but might accomplish the general purpose by any means which it deemed proper, in the instant case, by Act No. 7-E: Pittsburgh's Petition, 217 Pa. 227.

Act No. 7-E does not create a debt against the Commonwealth within the meaning of article IX, section 4, of the Constitution: Erie City's App., 91 Pa. 398; Keller v. Scranton, 200 Pa. 130; Montgomery v. Martin, 294 Pa. 25.

It will be seen by the figures in the tables that, based upon the actual collections for the first seven months of the biennium, there is an adequate balance even including the Talbot bill.

Act No. 7-E does not come within the prohibitions of article III, section 18, of the Constitution with respect to appropriations to persons and communities for charitable, educational and benevolent purposes: Russ v. Com., 210 Pa. 544; Busser v. Snyder, 282 Pa. 440; Com. v. Andrews, 211 Pa. 110.

The subject of Act No. 7-E is clearly expressed in the title as required by article III, section 3, of the Constitution: Gilbert's Est., 227 Pa. 648; Reeves v. Water Co., 287 Pa. 376; Carr v. Ætna A. L. Co., 64 Pa. Superior Ct. 343; Com. v. Budd Wheel Co., 290 Pa. 380; Carothers v. Phila. Co., 118 Pa. 468; Dailey v. Potter Co., 203 Pa. 593; Sugar Notch Boro., 192 Pa. 349.

Act No. 7-E is not a local law regulating the affairs of counties and cities within the meaning of article III, section 7, of the Constitution: Tosh v. Scholottman, 2 Pa. D. & C. 256; Morrison v. Bachert, 112 Pa. 322; Com. v. Wert, 282 Pa. 575.

*George Wharton Pepper,* with him *Earl V. Compton, George E. Alter, James A. Montgomery, Jr.,* and *Gifford K. Wright,* amicus curiae.

*G. Coe Farrier,* Assistant City Solicitor, and *David J. Smyth,* City Solicitor, amicus curiae, for City of Philadelphia, filed printed brief.

OPINION BY MR. JUSTICE KEPHART, April 7, 1932:

Appellants, the secretary of welfare, the auditor general, and the state treasurer, appeal from the award of a peremptory mandamus, directing them "to perform the duties imposed......by the act" of December 28, 1931, P. L. 1503. The act is also known as Act 7-E or popularly the Talbot Bill. The question involved is the constitutionality of this act. It was sustained by the court below, and this appeal followed.

The governor, by proclamation, duly convened the legislature in special session, and it passed the act now in question. Both the first and supplemental proclamations of the governor will be found in the reporter's notes, as will also the act of assembly. There are many constitutional questions involved in this appeal, which will be disposed of in their order. In so doing, it must be borne in mind that: "In determining whether an act

of assembly is unconstitutional,......it should not be so held unless it is clearly, strongly and imperatively prohibited. 'If the act is within the scope of legislative power, it must stand, and we are bound to make it stand if it will upon any intendment...... Nothing but a clear violation of the Constitution,—a clear usurpation of power prohibited,—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void': P. R. R. Co. v. Riblet, 66 Pa. 164, 169. Every presumption should be indulged in its favor and one who claims an act is unconstitutional must prove his case beyond doubt: Collins v. Lewis, 276 Pa. 435, 438; Sinking Fund Cases, 99 U. S. 700; Mugler v. Kansas, 123 U. S. 623, 661": Busser et al. v. Snyder et al., 282 Pa. 440, 449. "It is the duty of every judge ......to search for a construction which will support the legislative interpretation of the Constitution, and an act can never properly be declared void unless this is found to be impossible": Com. v. Hyneman, 242 Pa. 244, 264. A statute will be declared unconstitutional only "when it violates the Constitution *clearly, palpably, plainly;* and in such a manner as to leave *no doubt* or hesitation" in the mind of the court: Sharpless v. Phila., 21 Pa. 147, 164. "An act of the legislature is not to be declared void, unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt": Com. ex rel. O'Hara v. Smith, 4 Binn. 117, 123. "This utterance of one hundred years ago has been repeated times without number, down to the present hour, without shadow of turning": Com. v. Hyneman, supra, page 247.

Article III, section 25, of the Constitution reads:

"When the General Assembly shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of the governor calling such session."

This constitutional provision contemplates that there shall first exist in the executive mind a definite concep-

tion of the public emergency which demands an extraordinary session. His mental attitude or intention is expressed in his proclamation, the purpose of which is to inform the members of the legislature of subjects for legislation, and to advise the public generally that objections may be presented if desired. It is not only a guide or chart with respect to which the legislature may act, but also a check restricting its action so that rights may not be affected without notice. The proclamation may contain many or few subjects according to the governor's conception of the public need. While the subjects may be stated broadly or in general terms, the special business, as related to the general subject on which legislation is desired, should be designated by imposing qualifying matter to reduce or restrict. Although the subjects should be sufficient to evoke intelligent and responsive action from the legislature, it is not necessary that they include all the methods of accomplishment. The guiding principle in sustaining legislation of a special session is that it be germane to, or within, the apparent scope of the subjects which have been designated as proper fields for legislation. In construing a call the words of any portion thereof must be interpreted not only as commonly and universally understood, but also as applicable to the subject intended to be affected by legislation.

While the legislature must confine itself to the matters submitted, it need not follow the views of the governor or legislate in any particular way. Within the special business or designated subjects submitted, the legislature cannot be restricted or dictated to by the governor. It is a free agent, and the governor, under the guise of definition, cannot direct or control its action. Nor is it confined to any one subject but may chose from parts of different subjects, provided a new subject, unrelated to those stated, is not acted upon: Chicago, B. & Q. R. R. Co. v. Wolfe, 61 Neb. 502, 86 N. W. 441. Unless these rules be followed, the constitutional mandate is

disregarded, and its entire purpose falls. Its mandate
is imperative and must be enforced: Pittsburgh's Peti-
tion, 217 Pa. 227, 230.

Though we have defined generally the rules applicable,
it is frequently difficult to determine just what legisla-
tion is valid under a given subject or subjects designated
in the call. A few illustrations will be enlightening. A
subject may be so broad or general, having so many ram-
ifications, that the special matter in relation thereto, on
which legislation is desired, must be stated in the call.[1]
Though a general subject is stated through a specifica-
tion of a particular matter in connection therewith, this
does not open the door for any legislation germane to the
general subject beyond the scope of the specification. It
must be confined to the specialized matter as interpreted
in view of the general subject.[2] The cases cited in the

---

[1] Thus, under a call for legislation "in any wise affecting cor-
porations," a law requiring railroads to fence their rights-of-way,
was passed. The call was too broad, covered too wide a field and
in effect named no subject, hence the act fell: Denver & R. G. R.
R. Co. v. Moss, 50 Colo. 282, 115 Pac. 696; Nielsen v. C., B. & Q.
R. R. Co., 187 Fed. 393.

[2] Thus where a call for an appropriation to maintain certain gov-
ernment agencies was followed by an appropriation for a National
Conservation Exposition, the general subject (appropriations) was
narrowed and limited by the specific matter to which attention was
called, and the above appropriation was held invalid: State v.
Woollen, 128 Tenn. 456, 161 S. W. 1006. A call for a law on the
subject of the erection of county bridges would not open the door
for any legislation on the general subject of bridges under county
control; therefore acts concerning their repairs or safety were not
good: Fayette Co. v. Co. Commissioners, 35 Pa. C. C. 401. A
call to enact legislation for the consolidation of contiguous cities
in the same county did not permit legislation for consolidating
cities generally or cities in close proximity: Pittsburgh's Petition,
supra. A call to enact road laws for one county did not include
the regulation of turnpikes generally: Columbia, etc., v. Hughes,
131 Tenn. 267, 174 S. W. 1108. A call for legislation relative to the
use of money in political campaigns and requiring a report from
political committees would not open for legislation the general
subject of elections: Likins's Petition, 223 Pa. 468.

note illustrate not only that legislation clearly outside the special matter, though related to the general subject, will not be sustained, but that where a general subject has been dealt with by naming a particular matter relating thereto, the call cannot further restrict the legislation within that subject.[3]  The subject must be stated with some particularity, but within the specified subject the legislature is fully empowered to act, just as they are forbidden to act when the general subject is not particularized.  There are some decisions [4] which go to the extent of holding that when a general subject is mentioned, the doors are thrown open to legislation on that subject, but these authorities appear to be in the minority and are opposed to the well-considered opinions of other states.

---

[3] A call to simplify court procedure was, however, sufficient to include an act regulating the length of the term of the court (Long v. State, 58 Tex. Cr. R. 209, 127 S. W. 208); and a call to amend attachment laws of the State by striking out named sections was in itself sufficient to include other causes of attachments; the specific subject of causes of attachment could not be further limited to those named by the governor in the call: In re Governor's Proclamation, 19 Colo. 333, 35 Pac. 530.  A call to amend the Australian ballot law in certain particulars permitted other amendments than those specified.  The Australian ballot law was itself part of a general subject, election laws.  Thus specialized in the call, the governor could not restrict the legislation on such a specific subject: People v. District Court, 23 Colo. 150, 46 Pac. 681. So a call for laws relating to compromising municipal debts gave implied authority to repeal certain acts necessary to reach compromises: Devereaux v. City of Brownsville, 29 Fed. 742.

[4] See Baldwin v. State, 21 Tex. App. 591, 3 S. W. 109, where the call was for legislation to reduce taxation, and the legislation imposed a new tax on a new subject, and it was upheld, the court saying the whole subject of taxation was before the legislature.  So in the same state a call seeking the prohibition of the sale of liquor within ten miles of a military camp was held to have opened the subject of general prohibition, permitting a state wide prohibition law: Ex Parte Davis, 86 Tex. Cr. Rep. 168, 215 S. W. 341.

State v. Woollen,[2] an authority stressed by both sides, best sums up the general rules, stating:

"All [the cases] provide that the governor may confine the legislature, called in special session, to such subjects of legislation as he may prescribe......All the cases agree that, while the governor may so limit the subjects of legislation, he cannot dictate to the legislature the special legislation they shall enact on those subjects. In all of them the inquiry is finally reduced to the ascertainment of the subject or subjects embraced in the call ......determined by an analysis and construction of that paper as in the case of any other written instrument, and by a like analysis and construction of the legislation drawn in question for the purpose of deciding whether it is embraced within the call or message."

With this general survey of the matter in mind, we now discuss the governor's proclamation. The court below stated that, though none of the subjects designated by the governor "included an appropriation of money such as was made in the act of assembly before us," as the entire proclamation stated one broad general subject, "unemployment relief," any legislation germane to that subject might be considered. The governor, by his proclamation, indicated nineteen specific subjects of legislation, six of which related to unemployment relief. Unemployment is a broad and difficult subject and its relief more so. To be helpful as a designated subject for legislation at a special session, it would need some specification, in the absence of which almost every kind of legislation might be indulged in by the General Assembly, such as laws concerning taxation, appropriations, hours of labor, or, in general, the regulation of business affairs of individuals and corporations. Indeed, to construe the Constitution so as to permit this latitude would be subversive of its purpose, contrary to its letter and its spirit, and opposed to the principles outlined in the best considered authorities. Such construction would mean that the call would furnish no guide or chart for the leg-

islature, and would give no notice to the interested public. If this channel was the only way by which the bill could be sustained, in line with the authorities of other states, we would unhesitatingly declare it void. But we need not do this.

The governor having designated a channel of legislation through the subjects submitted to the legislature, it need not, in keeping within these subjects, be bound in the manner, method, or means of accomplishment as stated or implied in them (Likins's Petition, supra), but may, within a prescribed subject, add thereto, or modify or enlarge it so that, not losing its intimate relation with the subject designated, it may accomplish the purpose set forth in the particularization of the general subject designated in the call: State v. Pugh, 31 Ariz. 317, 252 Pac. 1018.

The preamble to the proclamation is an expression of the motive which impelled the governor to act, and recites that "the first duty of the Commonwealth is to safeguard the people and to make secure the lives, the liberties, and the happiness of men, women, and children." It goes on, "The right to work for a living is part of the right to live," and sums up, "the welfare of the people in this Commonwealth, as in the United States at large, is endangered by the prevailing unemployment, which has deprived one quarter of the workers of Pennsylvania of the opportunity to earn a living and this fact constitutes a binding obligation to act upon every unit of government, from the least to the greatest." To act on what? The answer is obvious, unemployment, the subject the governor had been speaking about, and which was depriving one quarter of our workers of the opportunity to earn a living. This was obviously his major purpose in summoning the legislature. It was not his whole purpose since other matters were submitted, but there cannot be the slightest doubt that unemployment relief was the chief thought in the governor's mind.

The subjects involved in the preamble submitted to sustain Act 7-E, are as follows:

"The creation of a state commission......[to] coöperate with......poor districts in affording relief to the unemployed and their families." An act "authorizing ......poor districts......to negotiate emergency loans for unemployment relief;" "authorizing counties...... and poor districts to levy taxes and expend money for unemployment relief"; "permitting local authorities under certain conditions to postpone tax sales during the periods of economic depression and unemployment"; "making new appropriations to......any department ......of the state government......to enable additional projects to be undertaken which will give work to the unemployed."

These channels of legislation having been pointed out, did the legislature go beyond the call to such an extent as to make its Act 7-E invalid? The statute states that: "Conditions of unemployment aggravate the normal situation facing public authorities charged with the care of the poor." "Section 1. That......in the assumption by the Commonwealth of its duty to the care of the poor, the sum of $10,000,000 is hereby specifically appropriated to the department of welfare for payment to political subdivisions charged by law with the care of the poor." Section 2 provides: "The department of welfare shall make an allocation......of the moneys......on a ratio that the estimated number of unemployed persons in a county bears to the estimated total number of unemployed persons in the entire Commonwealth." Section 4 provides: "Each political subdivision charged by law with the care of the poor shall have authority ......to expend the moneys received from the appropriation made by this act for the purpose of providing food, clothing, fuel and shelter for residents within their district who are without means of support."

It is urged that the act does not give unemployment relief, but poor relief, and that, since the two are distinct, in this view the act is not within the call. What is meant when the governor's call recommends a "commission......[to] coöperate with......poor districts in *affording relief to the unemployed*" and an act authorizing "poor districts to levy taxes and expend money for unemployment relief?" The governor's call shows his intention to be that unemployment relief should be taken up as poor relief by poor districts, and that the State should aid them. The powers of poor districts under the laws are and always have been limited to furnishing, support, food, clothing, fuel, and shelter, to poor persons, persons without means of support, and to no others. Then the only possible way open to a poor district to furnish relief to the unemployed would be when the unemployed were poor persons within the law. The governor did not intend, nor did his call include an unlawful purpose or one prohibited by the Constitution; he did not intend to include the unemployed who had means of support, the unemployed who were not poor persons under the law. Such being the consequences of his deliberate acts he must have meant unemployment relief in the sense of poor relief, for that was the only relief the poor boards could give. When the governor used the term "unemployment relief" in connection with poor districts, he meant persons who were unemployed and without means of support, or poor persons, and the relief to be given was poor relief.

The legislature, recognizing the governor's idea was that unemployment relief should be handled through the poor districts as poor relief, aided through borrowed money and a state commission, decided that aid could be most promptly and effectively given through an appropriation as in Act 7-E. The fact that the act included, in addition to the vast number of unemployed without means of support, or poor persons, a small number of poor persons who are such from other causes, should not

invalidate the act as being without the call, especially as the governor well knew, in suggesting that poor districts furnish unemployment relief, that such class must of necessity be included. The act does not introduce a new subject, as unemployment relief meant poor relief; such inclusion was not only within the legislative power but without it the act would have been seriously imperilled, as seen later in this opinion. See Likins's App., supra, and authorities, note 3, supra, also last paragraph of this opinion.

The General Assembly was not bound to enact legislation covering one entire subject. An act may look to one subject to sustain part of it and to another subject to sustain another part; provided it does not, however, distort the subjects into an unrecognizable shape and create a new subject: Chicago, B. & Q. R. R. Co. v. Wolfe, 61 Neb. 502, 86 N. W. 441. Then, too, the legislature has implied powers to make legislation within the subjects designated effective as such by enacting other legislation that will aid in accomplishing that purpose: Dexereaux v. Brownsville, supra, note 3. Such legislation must be clearly relevant for that purpose.

While the act was proper under the subjects stated, there was another part of the call authorizing an appropriation for new plans to give work to the unemployed which may be considered. Turning again to section 4 of the supplemental proclamation, we find the legislature may make "new appropriations to......any department......of the state government......to enable additional projects [plans] to be undertaken which will give work to the unemployed." Construe the word "work" as synonymous with the word "relief" in the light of the preamble and the subjects above mentioned in which unemployment relief was the dominant purpose, and it does not strain the imagination to say that "give work to the unemployed" may include provisions enabling the unemployed to secure work by taking care of their bodies. A man's ability to work depends

upon his physical condition. A starved man is not able to work, and the first step to bring him into condition to work is to feed him. The word "work" may well be used in the sense of relief, and is so used; and since the word "unemployed" applies to those who have no sustenance on which to live, this subject would cover the act. The tenor of the call being unemployment relief, which is poor relief, this thought naturally follows.

The legislature determined to accomplish the purpose stated in the call through Act 7-E by using existing agencies of the State and counties, and by furnishing aid to the unemployed through the poor districts, as the state agency. The legislature used its own method of accomplishing the governor's purposes designated in the call.

Paragraph 4 of the supplemental call designates an *appropriation* to any department. The Talbot Act appropriates to the department of welfare. Complaint is made that the appropriation was not given to the department of welfare, but to another agency of government; but this cannot be correct. The bill gives $10,000,000 to the department of welfare, which must perform certain duties in relation thereto. Instead of permitting that department to be the spending agency, as the legislature may well have done, it designated other governmental agencies which, under that department, spend the money. This is merely another detail of accomplishment of the designated purpose, and is purely a legislative matter, embracing the manner, method, or means by which the money may reach its ultimate destination and accomplish the purpose designated in the call. The act must be construed, if at all possible, as an efficient, workable system, and we so find it. No doubt it might have been better drafted, but there are no manifest imperfections of substance which defeat the full accomplishment of the end sought to be attained.

It follows from all we have stated above that Act 7-E is within the designated subjects mentioned in the call.

Article IX, section 4, of the Constitution provides:

"No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasions, suppress insurrection, defend the State in war, or to pay existing debt; and the debt created to supply deficiencies in revenue shall never exceed, in the aggregate at any one time, one million of dollars."

The balance of estimated revenues for the biennium, after the regular session of the legislature, was $192,-915,000, and the authorized appropriations were $192,-394,000. At the special session, prior to the Talbot bill, $716,000 was appropriated; with it the appropriations of that session totaled $10,716,000. Defendants contend that, since the appropriation made by this bill, with prior appropriations already made, exceeded the estimated revenues for the biennium, the excess appropriations were invalid.

The court below held that, though strict constitutional limitations were imposed on municipalities in the creation of debts, this was not so with respect to the sovereign state; that there was no limitation to the debt the latter might incur except when created to supply deficiencies in revenue. This conclusion is erroneous. Under article IX, section 4, the creation of a debt without the direct sanction of the people is not only limited, but absolutely prohibited, except to repel invasions, suppress insurrection, defend the State in war, supply deficiencies in revenue up to $1,000,000. Under the Constitution, neither the legislature, the officers or agents of the State, nor all combined, can create a debt or incur an obligation for or on behalf of the State, except to the amount and in the manner provided for in the fundamental law. This section was intended to restrict legislative acts which incurred obligations or permitted engagements on the credit of the State beyond revenue in hand or an-

ticipated through a biennium, and establishes the principle that we must keep within current revenue and $1,000,000. There can be no such thing as a floating debt created through appropriations in excess of revenues and $1,000,000. Such debt may not be directly incurred by statute, nor through an appropriation in excess of current revenue for a gratuity or any purpose. The determination of the question whether Act 7-E creates a debt necessitates a study of the Constitution as it relates to revenues and appropriations.

Legislative power is vested in the General Assembly by article II, section 1, and its power is supreme on all such subjects unless limited by the Constitution. The control of the state's finances is entirely in the legislature, subject only to these constitutional limitations; and, except as thus restricted, is absolute. Unless expressly prohibited or otherwise directed by that instrument, appropriations may be made for whatever purposes and in whatever amounts the law-making body finds desirable. The legislature in appropriating is supreme within the limits of the revenue and moneys at its disposal.

Among the constitutional requirements are the provisions (article IX, section 12) that "The moneys of the State, over and above the necessary reserve, shall be used in the payment of the debt of the State, either directly or through the sinking fund," and, by article IX, section 13, that "The moneys held as necessary reserve shall be limited by law to the amount required for *current expenses*." We had a state debt when the Constitution was adopted and the money required to pay that debt, or any state debt, was supplied, inter alia, by the assignment to the sinking fund of any part of the revenue over and above ordinary and current expenses of government. A survey of the Constitution would indicate that the ordinary current expenses of government would be the expenses of the executive, judicial and legislative departments of

government, and of public schools. It was the intention of the framers of the fundamental law to safeguard and protect these ordinary expenses, that the government might exist as such. Therefore, they have a preference or prior claim on all moneys of the Commonwealth over all other expenditures, expenses, debts, or appropriations. We have so held with regard to such expenses of municipalities. "Current expenses have first claim on ordinary revenues and contemplate operating expenses": Georges Twp. v. Union Trust Co., 293 Pa. 364, 370. The Constitution requires a reserve to be set up sufficient to take care of these preferred claims, and that such reserve be limited by law; but if the legislature fails to so limit it, it is the duty of the fiscal officers to safeguard the ordinary current monthly expenses of government.

The provision relative to the sinking fund for the state debt requires only $250,000 annually to be paid, and the transfer of a part of the revenue to that fund; that part, of course, being in the discretion of the legislature. But the ordinary expenses of government and the sinking fund payment are not the only preferred claims on revenues thus established and first entitled to payment. Article III, section 17, permits moneys to be given to charities and normal schools, money for charities if passed by a two-thirds vote. Money given to normal schools has priority on the general fund over an appropriation to charities, etc.: McLeod v. Central Normal School Assn., 152 Pa. 575, 589.

The balance of the general revenue, subject to constitutional limitations, is in the absolute and complete control of the General Assembly. It follows that it may create preferential appropriations for any purpose which, in its judgment, it deems necessary in the interest of government, and such appropriations will have a claim on this surplus prior to other appropriations not so favored. See State v. Burke, infra. It may be the question of unfair classification might affect these pref-

erences, but there is reasonable and proper basis for the preference in this act.

Any appropriation which embodies an intention to pay the amount therein stated before any other appropriation made at the same session of the legislature, or any appropriation which stipulates the time at or within which it must be paid, will take rank as an appropriation next to the ordinary expenses of government. Priority is a question of intention and prior claims rank equally unless there is an intention shown to the contrary or expressed through the Constitution.

The fiscal officers of the Commonwealth are required to treat such appropriations as having such priority, provided always that, at the time payment is directed, there are funds available in the treasury to meet such payment above all requirements for the current expenses of government. No administrative custom or scheme of payments under unpreferred appropriations will avoid these consequences or that of a deliberate legislative act in preferring an appropriation. If other appropriations are compelled to suffer because of this preference, the complete answer is that it is the legislative will, and, as the sovereign people have thus spoken through their designated agent, no one can complain. If appropriations for other charities and hospitals, equally meritorious and perhaps some more deserving, are made to suffer because of insufficient revenue, the fault lies with the legislature in not providing means when it had the opportunity. When we as judges consider their mandate it is of no moment to us, acting in a judicial capacity, that these other appropriations may suffer. If there are ample funds in hand, of course, or if funds later become available, no difficulty will be experienced.

The Talbot bill, known as Act 7-E, specifically appropriates $10,000,000, to the department of welfare, and contains a mandatory direction to the state treasurer to pay certain sums at fixed periods; $1,000,000, in Decem-

ber, 1931, $2,000,000, in each of the succeeding four months, and the remaining and final $1,000,000 in May, 1932. The amount, the time, and the purpose of payment, are thus definitely stated in the act. The legislature intended these payments to take priority over other payments at the times mentioned, and the purpose stated in the act furnishes a reasonable basis for such action. To effectuate its purpose, it was not necessary for the legislature to expressly state, "this appropriation shall take precedence over all other appropriations"; that is done by the act's mandatory provisions, which accomplish the same result. We assume the legislature must have considered the possible revenues when it issued its mandatory decree to the state treasurer to pay this money as it directed, and that it also considered the condition of the treasury.

But it is urged that, notwithstanding this preference, the legislature had already appropriated all the estimated revenues at the general session, and, as there were no funds or anticipated revenues against which this appropriation could be preferred, it is void. This contention wholly overlooks the fact that under our financial scheme of government, while the receipts of revenue come in daily or yearly, our fiscal period is biennial, and revenues for that period are the subject of legislative distribution. This can be made only from revenue accruing during the biennium, and any other available cash assets on hand that may be used for that purpose. From this sum all appropriations, whether made at a general or special session, must be met. An appropriation does not speak from the date of approval of the measures, but from a consideration of that appropriation and other appropriations during the same biennium, and the estimated revenue; and, if there is a shortage of revenue beyond $1,000,000, it is not a given appropriation, the last one made, that is singled out for rejection by the fiscal officers, but all must suffer alike and abate proportionately. If the budget is not bal-

anced by the governor, then all appropriations must suffer proportionately except those in the preferred class. There is no priority among appropriations of the same class in any one biennium.

"Statutes enacted at the same session of the legislature should receive a construction, if possible, which will give effect to each. They are within the reason of the rule governing the construction of statutes in pari materia. Each is supposed to speak the mind of the same legislature, and the words in each should be qualified and restricted, if necessary, in their construction and effect, so as to give validity and effect to every other act passed at the same session": White v. Meadville, 177 Pa. 643.

Therefore, appropriations made at a special session must be considered in connection with and in relation to appropriations of the general session just as new revenue is included in and is a part of the general revenue for the two-year period.

State v. Burke, 37 La. Ann. 434 (1855), illustrates appropriation preference and abatement. There the relator endeavored to have a warrant paid and alleged that the state treasurer was about to pay other warrants in preference to his. The appropriations exceeded the revenue and the treasurer pointed out that all could not be paid, and that certain were entitled to preference because such was "expressly given by legislative act" or because they were in support of institutions recognized by the Constitution. The court said:

"All warrants, except the two classes [constitutional and universities] whose rank has already been settled, are ordinary warrants of the same rank, and are entitled to a pro rata distribution of the funds on which they are drawn, *unless the legislature expressly gives some a preference over others. When* an appropriation has been made which the legislature can constitutionally make and *a preference* in payment of it over all others or over certain others *has been accorded by the act, we do not*

*conceive that the judiciary can control the legislative will* in that regard." See also Stuart v. Nance, 28 Colo. 194, 63 Pac. 323.

To give effect to the Talbot bill it was not necessary that there should be a specific repeal of any particular prior appropriation. The act itself effected a repeal of so much of other appropriations not in its class as would be necessary to make good this express mandate of the legislature. The result is that a debt is not and cannot be created by merely making appropriations which direct expenditures in excess of anticipated revenue, and the legislature cannot so enact. Appropriations in excess of estimated revenues and $1,000,000 are simply ineffective; they incur no liability or obligation on the part of the State; they simply abate pro rata to be within the biennium receipts and cash in hand.

With this determination of the case, we will not undertake to review the many authorities from other states cited by counsel where, through contractual obligations, debts were or would be precipitated on the State in violation of its Constitution: State of Ohio v. Medbery, 7 Ohio State 522; Newell v. People, 7 N. Y. 8; In re Advisory Opinion to Governor, 94 Fla. 967, 114 So. 850; nor from those states which have constitutional restrictions on appropriations in excess of current income: In re State Warrants, 6 S. D. 518, 62 N. W. 101; State v. Kenney, 10 Mont. 488, 26 Pac. 383; In re Appropriations by General Assembly, 13 Colo. 316, 22 Pac. 464; Parks v. Commissioners of Soldiers' and Sailors' Home, 22 Colo. 86, 43 Pac. 542. An appropriation may contain in it all the elements of a contract which, when carried through, may of itself create a debt. On the other hand, where the appropriation authorizes the payment of a gratuity, it is not a debt within the meaning of the Constitution; if there is not sufficient revenue provided to meet it, a debt must not be created either by issuing warrants, lending credit, borrowing or otherwise, to meet the ap-

propriation; such appropriation, or such part of it as cannot be met, simply falls. It is invalid.

The record shows that on June 1, 1931, the State had cash in bank amounting to more than $49,000,000, and since that date up to December 31, 1931, when this first payment was due under the Talbot bill, revenue had been collected up to another $49,000,000 or a total of $98,000,000, more than half of the anticipated revenue for the biennium. It is apparent there was a prima facie right on the part of the appellees to have their claim paid, and it follows that no objection could successfully be made against this appropriation on account of article IX, section 4,

Article III, section 18, of the Constitution provides:

"No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association."

It is the contention of the attorney general that Act 7-E violates this provision of the Constitution in that the counties or poor districts which receive the money must be classed as communities, having been so defined by this court; that an appropriation to be used in the discretion of such recipients is an appropriation for a charitable or benevolent purpose; and, further, that relief to the poor is a matter of local concern.

May these contentions be sustained in light of the construction which the above section of the Constitution has received by this court? Act 7-E provides for poor relief in which is included relief for the unemployed without means of support. Is this a proper subject for legislative action? In Busser v. Snyder, 282 Pa. 440, where we considered an old age pension act, we held that the test for persons entitled to poor relief was, were they persons without means of support? The act there provided for discretionary payment of $1 a day to those of seventy years or upwards whose incomes did not exceed

$365 a year and whose property did not exceed in value $3,000. An effort was made to bring this class of persons under the poor laws, but we held that the persons entitled to old age pensions by that act were not poor persons within the meaning of our poor laws (i. e., persons without means of support), certainly not where the act included citizens able to help themselves, who had estates up to $3,000 and incomes up to $365 a year. It does not require much imagination to show the contrast between the persons considered in Busser v. Snyder, supra, under the Act of 1923, and those entitled to relief under the poor laws. We further held in that case that the money proposed to be given under the old age pension was a benevolence and that the persons who were to receive it were persons or a community within the Constitution. The words, "person or community," were not limited to a single person or place, but were used in an inclusive sense relating to groups or classes of persons wherever they might be in any part of the State. We held the act unconstitutional as an effort to give the State's bounty to a definite class of persons who had means of support, and if Act 7-E was a parallel to that act, we would unhesitatingly decide the same way. But it is not.

As pointed out in Busser v. Snyder, supra, there is a vast distinction between the two subjects under consideration in so far as they relate to the constitutional prohibition. Poor persons, as understood by our laws, were always considered in an entirely different aspect from members of the public who had means of support. We will here again briefly discuss what we there stated as to caring for those historically known as poor persons, which was as follows:

"There is no direct prohibition against the use of state money to pay for the care and maintenance of indigent, infirm and mentally defective persons, *without ability or means to sustain themselves,* and other charges of like nature. They become direct charges on the body politic

for its own preservation and protection. *As such,* in the light of an expense, *they stand exactly in the same position as the preservation of law and order.* To provide institutions or to compensate such institutions for the care and maintenance of this class of persons has for a long time been recognized as a governmental duty and ......such appropriations may well be sustained on this theory."

This was said in defense of appropriations to nondenominational and other institutions and persons, a comparison having been drawn between the use of state money as provided for in the old age pension act and the use of state money by hospitals, and old age homes, for treatment of poor persons. To expend money for such purposes has long been recognized as a function of government; only the manner of its *administration* is restricted by section 18 of article III. Busser v. Snyder, supra, restates what was said in Collins v. State Treasurer, 271 Pa. 428, 433, as to the use of the state's money and the intent of the constitutional prohibition. Then later on (in Busser v. Snyder), speaking on the same subject, the use of state money for the poor, we said: "The thing which for more than two hundred years fixed the charge [poor relief] on the Commonwealth was the fact that......[some of its people were unable] to support themselves......[were] without means of support. The Constitution of 1873 recognized this condition as a public liability. Nothing is said therein prohibiting, interfering with or controlling the performance of the duty."

We also held in that case that the old age pension act could not enlarge a class (the poor) well known to those who adopted the Constitution and who knew of the government's responsibility for their keep.

We again held in Collins v. Martin, 290 Pa. 388, that the care of the poor as generally understood was a fixed governmental duty similar to the enforcement of law and order. It was there contended by our distinguished

attorney general, citing Busser v. Snyder, supra, that "An appropriation to enable a branch of the state government to perform a governmental duty is not an appropriation for charitable purposes," even though it was worked out through a sectarian institution. We held that while there was a duty, whether it be absolute or discretionary, it could not be performed in a manner prohibited by the Constitution. So as not to confuse the performance of the government's duty with the manner of performance, we there said:

"Whether the charitable work is compulsory or discretionary, the performance is controlled by the Constitution. No function of government can be discharged in disregard of or in opposition to the fundamental law. ......the performance of a function or duty can not take place in [a] prohibited way."

"The intent of these [constitutional] provisions was ......to forbid the State from giving......to a religious sect or denomination......the money of the people......for administration or distribution:" Collins v. State Treasurer, supra.

In those cases we refused to approve acts because the institutions affected were prohibited by the Constitution from receiving the money. We restated in Collins v. Martin, supra, what was said in Busser v. Snyder, supra, that the obligation of the government to care for poor persons was not a charitable undertaking any more than the performance of any other public function is a charity.

Considering the subject of this case, we find Act 7-E makes an appropriation for the relief of the poor. We again hold that the support of the poor,—meaning such persons as have been understood as coming within that class ever since the organization of the government, persons who are without means of support, the same persons stated in the Talbot bill, Act 7-E,—is and has always been a direct charge on the body politic for its own preservation and protection; and that, as such, in the

light of an expense, it stands exactly in the same position as the preservation of law and order. The expenditure of money by the State for such purposes is in performance of a governmental function or duty and is not controlled by the constitutional provision, if the purpose is to supply food and shelter to the poor, including those who are destitute because of enforced unemployment, provided only that the money be not administered through forbidden channels.

The appropriation, in providing for relief of poor, comprehended those who had been driven into that situation through enforced unemployment, they having no means to support themselves. From this cause the ranks of the poor have increased so rapidly as to stagger the people of our State. The fact that their numbers are swollen through unemployment does not change the established concept of poor persons. To hold that the State may not under the Constitution now aid such people, even though it be a governmental duty, would be to deny to the State the right to perform not only an important, but, at this time, a most pressing governmental function. To hold that the State cannot or must not aid its poor would strip the State of a means of self preservation, and might conceive untold hardships and difficulties for the future. It is no answer to say that the people generally should take care of the situation; whether they are or are not able to do so, does not relieve the State of its duty. The framers of the Constitution never intended that the instrument should deprive the legislature of this power. We have so held in Collins v. State Treasurer, supra; Busser v. Snyder, supra, and again in Collins v. Martin, supra. The State has these many years recognized this duty by building or aiding in the maintenance of insane asylums and hospitals for treatment of the mentally and physically deficient poor, and has given other poor relief.

But when the unemployed, with ability to work, have work offered to them, and they, without good reason, do not work, they are not poor people entitled to support within the poor laws of this Commonwealth. The poor authorities cannot furnish relief in any form to such persons. When work is offered such unemployed, they have the means of support, and neither the State nor the poor district would be permitted thereafter to keep, maintain, or support such persons in idleness or laziness, or further some other object equally as vicious. This would be true even if the families of such persons suffer because the one responsible for their maintenance refuses to work. It is the duty of every citizen, particularly public officials, to aid those entrusted with furnishing this relief, to see that it is not given to those not entitled to receive it. If the poor officers violate their duty by furnishing support to such unemployed persons, the State authorities may, through any agency, stop payments for such uses. The purpose of the State's relief is to furnish maintenance to poor persons, including those who, through enforced unemployment, have no means of support, and not to those who have such means.

The attorney general, one of the ablest constitutional lawyers in the State, concedes in his argument: "If in this case the court had before it an act providing that a state agency should supply food and shelter to those who are destitute because of enforced unemployment, and making an appropriation for the purpose, we should not be here urging the court to strike it down as a violation of article III, section 18, of the Constitution." He urges only that a county or poor district cannot do this, that it is contrary to the Constitution because the payments are discretionary with these authorities. But this objection will not avail. This being a governmental duty, it can be performed by the government, or by one of its delegated agencies or by an agency not prohibited by the Constitution from performing it.

Having twice decided that appropriations to perform obligatory public duties or functions are not charities or benevolences, we again hold that the State, in performance of its governmental duty to take care of the poor, is not forbidden by article III, section 18, either directly to assume this obligation, or to permit and aid one of its subsidiaries of government to perform it, or to have it performed by an institution not forbidden by the Constitution. As long as these channels are kept clear, constitutional inhibitions will not disturb such acts.

The act is intended to cover poor relief all over the Commonwealth, it was not limited to any particular locality. It embraces all persons within the historical definition of the term. There is no discrimination. When the legislature directed the money to be given to the department of welfare, with certain duties to perform, and then in turn selected the poor districts as governmental agencies to secure proper distribution, the State has within its hands the right and power to compel its proper administration. The act has not raised subordinate municipal bodies over their creators. Moreover, the State frequently selects county officials as agents to perform governmental duties. The officers of the poor districts in counties were selected as the most efficient means of administering the fund, and the territorial lines of the counties, which ordinarily limit the jurisdiction of such officers, limit their administrative powers as state agents over the fund. But people who receive it in one county are the same type of people as those who receive it all over the State; that is, poor people without means of support. Therefore, the administrative officers, the poor directors of the county, in administering this fund, are not communities within the letter or spirit of the Constitution, and as the persons affected are poor persons, in every town, city, and hamlet in the Commonwealth, they are not within the constitutional limitation.

Moreover, *the persons who are handling the money can be compelled by the courts to see that it is properly administered* as directed by law. Mandamus is a powerful remedy and the attorney general may compel a reimbursement to the state treasurer of moneys not properly spent and may force the officers of the poor districts to spend it in the way the sovereign dictates,—that is, for food, etc., in relief of poor persons. The State does not lose control over the money; if there should be any abuse of the powers granted, most likely an enraged public will compel obedience through the courts. That the act called for an audit by the auditors of the subdivisions does not prevent the State, within its general powers, from making its own audit.

The court below held that even though Act 7-E be prohibited by article III, section 18, and article IX, section 4, inasmuch as the legislature had declared it to be enacted under police power, these constitutional prohibitions would not apply, citing several of our cases to sustain this theory. The police power cannot be indiscriminately used as a prop to thrust the Constitution aside. More particularly is this so with respect to the debt section. If the excess appropriation had been a debt, it was clearly within the constitutional power of the legislature to provide sufficient revenues, and, having failed to do that, it could not seize on the police power provision to sustain its unlawful act. Under any circumstances the police power may not be used to strike down a constitutional prohibition when the legislature could by other means bring the act within the Constitution.

But, while courts will not hesitate to sustain a proper exercise of the police power under circumstances of extraordinary nature (as for instance where its exercise is necessary for the preservation of government), even though a positive constitutional provision stands in its way, the circumstances which call for such exercise must definitely and clearly appear, and the exercise must be

in furtherance of a clearly defined major object of government. These instances are rare; therefore, the power in this respect has been sparingly sustained. Merely because the legislative ordinance has declared that it is enacted in the protection of health, safety, morals, and welfare of the government and its people, does not make it so.

If it was necessary to resort to the police power to sustain the present act, we would decide against such use. When this act was passed, there was no such situation presented to the legislature as would warrant the exercise of this high prerogative of government.

Article III, section 3, provides that "No bill...... shall be passed containing more than one subject, which shall be clearly expressed in its title," and appellants' position is that, inasmuch as, under the act duties devolved upon certain officers without notice to them in the title, the act was void. The act is entitled, "An act making an appropriation......to the department of welfare for state aid to political subdivisions charged by law with the care of the poor, and providing for the allocation and use of the moneys so appropriated."

All poor authorities, whatever their official relations may be, certainly had ample notice through the title that the legislature was about to do something in which they were interested. We have often stated the title of an act need not be a synopsis of it. The purpose of the constitutional provision was expressed in Sugar Notch Boro., 192 Pa. 349, 355, and this act is not in conflict with the restrictions there stated. The county commissioners and treasurers are named for certain purposes, but the duties imposed on them are not burdensome duties, they simply receive their quota of the appropriation allotted, and turn it over to the poor directors charged with the care of the poor. No new subject is introduced. These officers are merely the instruments which pass the fund on for administration.

Moreover, unless a substantive matter, entirely disconnected with the named legislation, is included within the bill, the act will not be declared in violation of the Constitution as offending section 3, of article III: Carr v. Ætna Accident & Liability Co., 64 Pa. Superior Ct. 343, 349. It is not so here. Thus in Com. v. Macelwee, 294 Pa. 569, the title was attacked in the same manner because the act required the township treasurer in townships of the first class to collect poor taxes, and there was no suggestion in the title that that act had anything to do with poor districts. We refused to sustain such contention, holding: "An act concerning townships is notice to all persons located therein and to every subordinate municipal division......that there may be, in the body of the act, something which affects his or her interests." In Orlosky v. Haskell, 304 Pa. 57, where the Vehicle Code of 1929 was attacked because the title made no reference to the service of process issued out of the courts of counties other than those in which the court had jurisdiction, the question was similarly determined in favor of the constitutionality of the act. Other cases might be cited to the same effect. Most of the appellants' cases refer to instances where positive burdens were placed on subdivisions of government or officials of them without notice to them. It is not so in this present act of assembly. The act is not void for that reason.

Article III, section 7, of our Constitution states that: "The General Assembly shall not pass any local or special law......regulating the affairs of counties," and article III, section 34, permits the legislature to classify "counties."

Appellants contend that to the extent that the act requires certain county officers to procure information regarding unemployed persons in their districts, it regulates the affairs of these counties, and to the extent that it imposes a like duty on the welfare department of Philadelphia, it regulates the affairs of the city. The

commissioners of fifteen counties out of sixty-seven are required to perform this duty; Philadelphia and Pittsburgh are the only cities.

There is no unconstitutional classification. The act appropriates funds to all political subdivisions charged with the care of the poor. No one in particular is singled out. As we said in Sugar Notch Boro., supra, page 356:

"It is the settled law since Wheeler v. Phila., 77 Pa. 338, that classification based on genuine and substantial distinctions is within the constitutional power of the legislature, and an act which applies to all the members of the class is general and not special."

The officers selected are the officers of the poor districts throughout the State. The mere fact that in some counties offices may be filled by such commissioners, in others by poor directors, in a few other districts by overseers of the poor, and in the Cities of Philadelphia and Pittsburgh by the department of welfare, does not present a case of unconstitutional classification. The act says the State is "assuming its obligation to care for the poor," and it proposes to do it through poor districts. The act does not regulate the affairs of counties in imposing state duties on these officers, who are otherwise in control of the local affairs of their districts, the duties imposed being to procure the information and administer state funds. It is not a special act regulating the affairs of any county.

The classification of poor districts is and always has been very badly mixed up. They do not adhere to county lines, and, as we understand, in some instances overlap into other counties. Parts of cities are joined with parts of townships and separate districts within a city. In many of the counties, the commissioners are in authority, in some districts overseers, in others poor directors. This classification was well known when article III, section 7, of the Constitution, and the amendment later permitting the classification of counties were adopted, and it will be noted that article III, section 7,

did not include poor districts among the divisions interdicted from special laws. No doubt this was because, as they then existed, it was deemed wise not to disturb them. It may be argued that as to these districts, section 7 of article III does not apply.

There are a few other questions raised by the attorney general. Are Pittsburgh and Philadelphia political subdivisions charged by law with the care of the poor, and as such entitled to receive state aid under Act 7-E? A review of the pertinent legislation on the subject of poor districts as affecting these cities discloses conclusively that both are such political subdivisions entitled to receive their allotment under Act 7-E. The department of welfare in Philadelphia is charged with the duty formerly devolving on the poor authorities, except as to six specially created poor districts. These duties originated under sections 18 and 19 of the Act of February 2, 1854, P. L. 21; later April 7, 1859, P. L. 400. Through successive legislative acts these duties have been continued until the Charter Act of June 16, 1919, P. L. 581.

Allegheny County is now divided into two districts, Pittsburgh and the territory without. By legislation similar to that of Philadelphia, all the duties pertaining to prior poor authorities devolve on the department of welfare of the City of Pittsburgh.

Relative to the allocation of the various amounts to the several districts as stipulated in the act and questioned by defendants, it must be conceded that this subject is difficult, but difficulties can not prevent an otherwise workable act from being valid. An exact scheme or chart, perhaps, cannot be laid out, but no doubt the officers in control, in obedience to the law, will carry it out according to its letter and spirit, and see that speedy and equitable allocations are made. Other questions concerning this matter have been discussed in other parts of this opinion.

We are not troubled with the meaning of the words "shall have authority," which bother appellants. One thing is quite certain, that the money may be spent only for food, clothing, and so forth, and if it is not all spent for that purpose, it must be returned to the State. We doubt if this question will ever arise. As to the expenditure of any of these funds for persons other than those who are poor because of enforced unemployment, there is this to be said to the credit of our communities: At no time except possibly once or twice since the organization of the State have these districts ever been in a situation to require state aid. They have always been able to take care of the poor because their numbers were so very small, in proportion to the people in the county. Today this number has been vastly increased by enforced unemployment compared with those who were poor in normal times. As a practical matter the state support will not reach any of those who were poor before the increase in their numbers; but the county's money will be used to take care of these persons, and to relieve the increased number of poor through unemployment. We have discussed this matter at this point as it is specially dealt with by the attorney general, but it might well be read with the discussion of the same matter in connection with the call. From all that has been said, it follows that the judgment of the court below was correctly entered.

Judgment affirmed.

CONCURRING OPINION BY MR. JUSTICE MAXEY:

I concur in the majority opinion. It is conceded that in the governor's proclamation convening the legislature in special session he designated "unemployment relief" as the subject upon which legislation was invited. In response to this call, the legislature after setting forth in a preamble that "present conditions of unemployment aggravate the normal situation facing public authorities charged with the care of the poor" appropri-

ated $10,000,000 to the department of welfare for payment to political subdivisions charged by law with the care of the poor. I cannot view this legislation as so transcending the subject of the governor's call as to make it unconstitutional. Cooley in the 8th edition of his Constitutional Limitations, volume 1, page 325, says of the constitutional requirement that the legislature shall consider no subject except that for which they were especially called together or which may have been submitted to them by special message of the governor that it "limits the power of the legislature to the enactment of such laws as *relate to the object* stated in the governor's proclamation or message."

I cannot conceive that any legislator or citizen of Pennsylvania who read the governor's proclamation calling the legislature into special session to enact legislation had any doubt that the object of the governor was to secure at the state's expense, the necessaries of life for those who because of widespread unemployment were so poor that they could not provide for themselves. If Pennsylvania had been devastated by earthquake or famine and the governor had called the legislature into special session for the purpose of considering the subject of "earthquake relief" or "famine relief" everyone would understand that he contemplated legislation extending pecuniary relief to those who had been impoverished by these destructive agencies. In the celebrated case of McCulloch v. Maryland, 4 Wheaton 316, the United States Supreme Court in an opinion by Chief Justice MARSHALL decided that though the Constitution itself did not specifically authorize congress to establish a bank, its power to do so was incidental to the express power "to lay and collect taxes, to borrow money, to regulate commerce, to declare and conduct a war and to raise and support armies and navies—that a government entrusted with such ample powers must also be entrusted with ample powers for their execution," and in that opinion Chief Justice MARSHALL laid down this

canon of constitutional construction: "We think the sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

This same canon of construction applies to a governor's proclamation calling a legislature into special session. Here the legislature was called to consider the subject of unemployment relief, i. e., relief for those suffering from involuntary unemployment. Clearly it was not intended by the governor that the legislature should enact a law to relieve the unemployed rich. The unemployed poor was the subject to which the governor directed the legislature to direct its attention. The legislature responded by enacting a bill directed to the pecuniary relief of the poor of Pennsylvania. Surely this bill came "within the scope" of the governor's call, it was "appropriate" so far as it provided relief for those impoverished by unemployment and it was "consistent with the letter and spirit" of the governor's call.

But it is argued that the act under review extends relief not only to those who are poor because they can obtain no employment but to those who are poor because of laziness, old age, sickness or inability or unwillingness to work, that the act is a poor relief act as distinguished from an unemployment relief act.

My answer to that argument is that while "poor relief" and "unemployment relief" may be technically different, as "secession" and "rebellion" were technically different, as Abraham Lincoln pointed out in his message of July 4, 1861, calling congress into special ses-

sion, yet under present conditions, unemployment relief and poor relief are practically the same thing as secession and rebellion were practically the same thing, as Lincoln held them to be in 1861. When poverty affects no greater number of people than it affects in normal times, the local poor districts and other subdivisions of government are able to take care of it, as they have done almost immemorially. When the present widespread poverty arising from unemployment affects such large numbers of people that local subdivisions are overwhelmed in attempting to cope with it, the sovereign Commonwealth has to come to the assistance of the local subdivisions as it did in the act now challenged. While it is theoretically correct to say that all the poverty now prevailing in Pennsylvania is not due to unemployment, it is obvious that such a large major share of it is due to that cause as to make the remainder of it a factor of negligible consequence in considering the question before us. As a matter of fact, the phrase "unemployment relief" is much more comprehensive than the phrase "poor relief," for while there are many unemployed who are not poor there are practically no poor except those who are unemployed. When a person is "employed" in the usual sense it is a reasonable inference that he is self-supporting. Therefore the legislature in enacting a poor relief bill did not go outside the scope of the governor's call but kept within it.

The poverty that has now become a menace to the well-being and peace and good order of the Commonwealth is poverty born of involuntary unemployment and no one even suspects or hints any other parentage. While it may be true that some of the dollars appropriated by the Talbot Act will go to those who would be poor even if times were normal, it is equally true that vast sums of money have already been spent and will continue to be spent by poor districts to ameliorate the poverty which arises solely from unemployment. So these subdivisions are doing more than ameliorating nor-

mal poverty—they are attempting to ameliorate poverty which is not merely a local affliction but a menace to the entire body-politic. Under these circumstances the fact that some of the money expended by the Commonwealth may happen to ameliorate a little poverty not arising from involuntary unemployment is in my judgment no sufficient ground for declaring unconstitutional a poor relief bill which resulted from the governor's call for a special session to consider unemployment relief. One rule of construction is that an act must be construed in the light of the evil it was designed to remedy. "Statutes are to be read in the light of attendant conditions": 25 R. C. L., page 959, section 215. It is also an accepted principle of construction that "when the constitutionality of a statute is questioned it is the duty of the courts to adopt such construction as will make the statute constitutional if its language will permit": 25 R. C. L., page 1000, section 243. In the case of McCulloch v. Maryland already cited, Chief Justice MARSHALL said: "Such is the character of human language that no word conveys to the mind in all situations, one single definite idea. Almost all compositions contain words which taken in their rigorous sense would convey a meaning different from that which is obviously intended. It is essential to just construction that many words which import something excessive should be understood in a more mitigated sense—in that sense which common usage justified." I interpret "unemployment relief" as used by the governor in his call to mean relief for those who are involuntarily unemployed for a long period and therefore impoverished. I think that the legislature in appropriating $10,000,000 to help the poor districts and other governmental subdivisions to bear the unprecedentedly heavy burden placed upon them by the widespread unemployment now prevailing acted upon the subject of "unemployment relief." I would not declare the act now before us unconstitutional because of a mere lexigraphic distinction between two words as closely re-

lated under present conditions as the words "unemployed" and "poor" now are in the public mind. I therefore agree with the majority of the court that the Talbot Act does not offend article III, section 25, of the Constitution limiting the legislature at special sessions to those subjects designated in the governor's call.

I also agree that the act does not offend article IX, section 4, of the Constitution in that the appropriation of $10,000,000 does not create a debt within the meaning of the constitutional provision prohibiting the creation of a debt by the legislature except for certain purposes which need not be enumerated here. If the total of appropriations for any biennium exceeds the revenues for that biennium that excess is only a gesture of legislative generosity and not a debt, for the appropriation expires with the biennium and leaves no indebtedness upon the Commonwealth.

I agree that the Talbot Act does not offend article III, section 18, of the Constitution prohibiting appropriations for charitable, educational or benevolent purposes to any person or community. I hold that an appropriation of state money to combat widespread poverty arising from unemployment can no more justly be characterized as "charity" or "benevolence" than could an appropriation of state money with which to combat a plague sweeping over Pennsylvania. An act manifestly dictated by enlightened self-interest is not an act of charity. Expenditures which are made as a matter of self-protection cannot be classed as benevolent.

The greatest menace to the well-being and safety of the State is for it to have hundreds of thousands of its able-bodied and willing citizens suffering, with their families, from hunger and lack of clothing and shelter because work is unobtainable. An appropriation from a public treasury to relieve this suffering is no more a "charitable" appropriation than an appropriation made

to suppress an uprising, repel an invasion or to combat a pestilence.

I find nothing in the Talbot Act that contravenes the Constitution.

DISSENTING OPINION BY MR. JUSTICE SIMPSON:

Defendants, who are respectively the secretary of welfare, the auditor general and the state treasurer of the Commonwealth, appeal from a judgment awarding a peremptory mandamus, directing them "to perform the duties imposed upon and required of each of them under the provisions of the Act" of December 28, 1931, P. L. 1503. The only question involved is the constitutionality of that statute. It was sustained by the court below, and this, appellants allege and I agree, is the error which should require a reversal of the judgment.

The act was passed at a special session of the legislature, duly convened by the governor, his proclamation calling it being printed in the pamphlet laws of that year at page 1489, and his supplemental proclamation at page 1493. In order to sustain the statute, the court below construed the proclamation as embracing, inter alia, the general subject of "unemployment relief," and held that the act dealt with that subject. Neither by that tribunal, nor by counsel for appellees, nor in the majority opinion, have we been pointed to any other subject, in either proclamation, which could be utilized to sustain it. I am willing to concede, for the purposes of this opinion, that "unemployment relief" was sufficiently designated in the proclamation, and that leaves open, on this branch of the case, but a single question: Is the statute one for "unemployment relief?" Upon it, I disagree with the majority of the court.

Article III, section 7, of the Constitution provides that "when the General Assembly shall be convened in special session, there shall be no legislation upon subjects other than those designated in the proclamation of

the governor calling such session." Those words are plain, ordinary words; none of them are technical or ambiguous, and each and all of them could have been readily understood by the body of the electorate, without even the necessity of looking into a dictionary to ascertain their meaning. Under such circumstances, we would not be justified in giving to them an unusual significance. "Where ordinary words are used in the Constitution, they must be construed in their popular and general sense, as the people who voted for it would understand them:" Hoffman v. Kline, 300 Pa. 485, 494. To the same effect are Collins v. Kephart, 271 Pa. 428, 434; Busser v. Snyder, 282 Pa. 440, 449, and numerous other cases. Upon this construction of the Constitution we all agree.

"The mandate of the Constitution is imperative that the legislature, at special sessions, shall pass no law upon any subject not designated in the call:" Pittsburgh's Petition, 217 Pa. 227, 230. The subjects "designated in the proclamation of the governor," cannot be broadened or narrowed by the legislature or the courts, in order to either approve or disapprove of a given statute. If they could, then the constitutional provision would not be mandatory, nor would its words "be construed in their popular and general sense, as the people who voted for it would understand them." For instance, if the governor designated the subject of "taxation" as one of those to be considered, then any and every branch of that subject—taxation upon capital stock, taxation upon inheritances, taxation upon moneys at interest, etc., etc.,—could be made the subject of legislation at the "special session;" and proof or even an admission of the fact that what moved him to make the call was only his belief that capital stock was not adequately taxed, would not result in the conclusion that no legislation was permissible except upon that particular subject. On the other hand, if the subject of the tax on capital stock was the only one designated in the procla-

mation, none of the other branches of the general subject of taxation could constitutionally be passed upon by the legislature at that session. Up to this point also the whole court agrees.

Moreover, if we were to hold that the Constitution intended that the governor could specify only general as distinguished from special subjects, appellees would not be aided. Since no power is given the legislature to enlarge the subject designated in the proclamation, an improper limitation could only result in there being no subject constitutionally "designated," and hence there could be no constitutional legislation relating to the subject either as designated or attempted to be enlarged. This is made clear in Denver v. Moss, 50 Colorado 282, 286. In that state, where the constitutional provision is substantially the same as ours, the governor called a special session, and designated as one of the subjects of legislation: "To enact any and all legislation relating to, or in any wise affecting corporations, both foreign and domestic, of a quasi public nature." Under it, the legislature passed an act requiring railroads to fence their right-of-way. It was held to be unconstitutional. The court said that, by the matter above quoted, the governor "specifically pointed out the persons, the class, the interests to be affected, but not the special business or subject-matter of legislation. He left the legislature to determine this for itself, when, by a direct and positive constitutional provision, that particular function was and is for him to discharge, and for him alone...... No subject of special legislation having been named, under this provision of the proclamation, no legislation whatever was competent...... If it be competent for the governor, after the general manner attempted, to authorize the General Assembly to select for itself the subject-matter of legislation and enact laws accordingly, then it is equally permissible for him, in his proclamation, to say that the General Assembly is called in special session 'To enact any and all legislation relating to

or in any wise affecting the qualified voters of the State, or the taxpayers of the State, or the citizens of the State,' and thus the door is opened wide for general legislation at a special session......[By this means] the constitutional provision [would be] utterly disregarded, and its main and most wholesome and salutary purpose, that of confining legislation to the specific subject-matter concerning which an emergency is believed to exist, completely nullified." The United States Circuit Court of Appeals for the Eighth Circuit reached the same conclusion: Nielsen v. C., B. & Q. R. R. Co., 187 Fed. 393.

It is no answer to say "that if the governor is permitted to dictate to the legislature just what specific bills it may pass, there would be a dangerous encroachment on the independence of the legislature." As usual in arguments of this kind, they have no bearing on the matter before the court. Neither the constitutional provision, nor our construction of it, lends the slightest aid to the imaginary power suggested. The legislature may pass as many bills as it pleases, and of as diverse a character, provided only their subject-matter is "designated in the proclamation," and, if it does not like those that are designated, it may refuse to pass any bills. True, this is a limitation on the action of the legislature during the special session; but that is exactly what the Constitution says it shall be. Moreover, as pointed out by both the majority and the minority in Perkins v. Phila., 156 Pa. 554, 565, 569, the constitutional convention of 1873 was called for the express purpose of limiting the power of the legislature, and even a perfunctory study of the Constitution will show that its provisions, in large part, resulted from that purpose. Those who will take the trouble to read that instrument, especially article III, and will note the flood of legislation in the sessions from 1850 to 1873, probably will not conclude that such legislative limitation is seriously objectionable; but, at any rate, the courts must interpret the

Constitution, not emasculate it, whatever may be the effect on legislative power. As to the statements in this paragraph there is no lack of harmony in the court.

Bearing steadily in mind the principles to which we have adverted, let us see whether the statute is one for "unemployment relief." The preamble recites that "Present conditions of unemployment aggravate the normal situation facing public authorities charged with the care of the *poor.*" Section 1 appropriates $10,000,000 "To the department of welfare for payment to political subdivisions charged by law with the care of the *poor.*" Section 2 directs that department to divide that sum "among the several counties of this Commonwealth on a ratio that the estimated number of unemployed persons in a county bears to the estimated total number of unemployed persons in the entire Commonwealth." Section 3 specifies the political subdivisions in the several counties to which the allotted money should be payable. Section 4 authorizes each such "political subdivision to expend the moneys received from the appropriation made by this act for the purpose of providing food, clothing, fuel and shelter for residents within their districts who are *without means of support.*" Section 5 directs that the funds received "shall be audited by the auditors of the respective political subdivisions in the same manner and with like effect as other moneys expended by such subdivisions." The sixth and final section provides that the "act shall be in force immediately upon its passage."

It will be noticed that in the expenditure of the fund appropriated by the act, there is not even an attempt to draw a distinction between those who are poor because they can obtain no employment, and those who are poor because of laziness, old age, sickness or inability or unwillingness to work from any other cause. The statute is, therefore, so far as expenditures under it are concerned, a poor relief act, as distinguished from an un-

employment relief act. Whoever is "without means of support" may get the relief, and the funds expended are to be audited, not by the State, but "by the auditors of the respective political subdivisions in the same manner and with like effect as other money expended by such subdivisions." It is not, therefore, an "unemployment relief" act, but a poor relief statute. At this point comes the vital disagreement with the majority of the court. It says: "The fact that the act may include in addition to the vast numbers of unemployed without means of support, or poor persons, a small number of poor persons who are such from other causes, should not invalidate the act as being without the call, especially as the governor well knew, in suggesting that poor districts furnish unemployment relief, that such class must of necessity be included." This is an express admission that, by the statute, the legislature attempted to enlarge the subject-matter of the call which, as we have shown, necessarily resulted in unconstitutionality. That it did so attempt is clearly set forth by section 4 of the act which authorizes the poor districts "to expend the moneys received from the appropriation made by this act for the purpose of providing food, clothing, fuel and shelter within their districts who are without means of support," without limiting the class to those who reached that condition by reason of unemployment, which is the only thing covered by the governor's call. If it were true, as stated in the above quotation from the opinion, that there are only "a small number of poor persons who are such from other causes" than unemployment, it would not aid the majority opinion, since there are no degrees of unconstitutionality,—if an act is unconstitutional it is forbidden, no matter how small or how great the unconstitutionality. Unhappily, however, the fact, so far as my experience goes, is not as stated, such other "poor persons" are far from being "a small number," and that number, small or great, may, in some or all of the poor districts, get the bulk of the fund appropriated

by the act. Nor is it accurate to say that "the governor well knew, in suggesting that poor districts furnish unemployment relief that such class must of necessity be included." He did not so suggest. The limit that he went was in clause 1 that the state commission on unemployment relief coöperate with poor districts in affording relief to the unemployed, and approve or disapprove plans for unemployment relief; in clause 2 that poor districts be authorized "to negotiate emergency loans for unemployment relief;" in clause 3 that a constitutional amendment be passed authorizing the state officers to pay back one-half of the amount borrowed for that purpose; and in clause 5 authorizing poor districts to levy taxes for unemployment relief. This being so, it is not accurate to say, as the majority do, that the governor's "deliberate acts [show] he must have meant unemployment relief in the sense of poor relief, as it was the only relief the poor boards could give." All these subsidiary matters are of little moment, however; the point is the majority opinion establishes that the statute is unconstitutional, but by a pure petitio principii attempts to carry its point at the expense of the Constitution.

That the statute is a "poor relief" act, and not an "unemployment relief" act is made clear also by the title to the statute, which is "An act making an appropriation under the police power and as a governmental duty to the department of welfare for state aid to political subdivisions charged by law with the care of the poor, and providing for the allocation and use of the moneys so appropriated." In this there is not a word relative to "unemployment relief," which, if it was to be the subject of the bill, should have been *"clearly* expressed in its title" if the act was to be held constitutional: Constitution of Penna., article III, section 3; Provident L. & T. Co. v. Hammond, 230 Pa. 407; Spangler's Est., 281 Pa. 118; Com. v. Pure Oil Co., 303 Pa. 112. Reasonable doubt as to the meaning of the language in the title is, of itself, sufficient to defeat the enactment: Guppy v.

Moltrup, 281 Pa. 343. The opinion of the majority as to the statute, reaches the remarkable conclusion that it must be construed to be unconstitutional in order to sustain it, whereas the law is that it must never be so construed as to be unconstitutional unless no other course is reasonably possible: Fluke v. Lang, 283 Pa. 54; Com. v. Pure Oil Co., supra.

I am of opinion, also, that the act is unconstitutional for the further reason that it violates the first part of article III, section 18, of the state Constitution, which provides that "No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational or benevolent purposes, to any person or community, nor to any denominational or sectarian institution, corporation or association." It is conceded, of course, that this statute is one "made for charitable ......or benevolent purposes," and hence the only question is—is it made "to any person or community?" I am of opinion it is made to both, and so the majority opinion concedes. Certainly the common people who adopted the Constitution would say that that section forbade either direct or indirect appropriations for charitable or benevolent purposes to any person or community, and so it has always been construed. The fact that, in the first instance, the appropriation is made to the department of welfare, is a matter of no moment; that body is but a conduit, for allotment purposes, to convey it to the poor districts of the State, who, in turn, distribute it among the poor, irrespective of the cause of their poverty.

We have considered this section of the Constitution a number of times in recent years (see Com. v. Alden Coal Co., 251 Pa. 134; Collings v. Kephart, 271 Pa. 428; Busser v. Snyder, 282 Pa. 440, and Collins v. Martin, 290 Pa. 388) and our construction of it has been "without variableness or shadow of turning." It suffices, however, to quote from Busser v. Snyder, at pages 451, 452: "Appellant further argues that the phrase 'to any per-

son or community' has a restricted meaning, and it is on these words the Commonwealth chiefly relies to sustain the act. In effect, appellant would have 'person' used in an individual rather than a collective sense,—certainly not broad enough to include the government acting in an administrative capacity, functioning through an agency, to work out governmental policies. Appellant argues that direct appropriations, in terms, are not prohibited to such agency, therefore the act is valid, even though the ultimate object may be to give to persons prohibited from receiving the money thus appropriated. This contention is not sound; 'person' and 'community' are not limited to the idea of a single person or place where persons are located; they are used in an inclusive sense, relating to an individual or a group or class of persons, wherever situated, in any part or all of the Commonwealth. It applies to persons, kind, class and place, without qualification. The language of the Constitution is an absolute and general prohibition. Nor does the fact that the appropriation is made to an agency (the intermediate and practical step by which public money is distributed to citizens) aid appellant's case. The gift is not to the commission, but to the particular persons selected by the legislature to receive it. The commission cannot use the money; it merely passes it on to the selected class. It is none the less a gift directly to the individual, even though it pauses for a moment on its way thither in the hands of the agency. Nor can the act be sustained because the appropriation is to an agency as an arm of the government, working out a governmental policy. What the Constitution prohibits is the establishment of any such policy which causes an appropriation of state moneys for benevolent purposes to a particular class of its citizens, whether under the guise of an agency, as an arm of the government through which a system is created, or directly to the individual. As said by the court below, this proposition 'is tantamount to saying the legislature can pass a law to do the

thing indirectly which the Constitution prohibits it from doing directly.' If this can be done, the Constitution imposes no restraint on the expenditure of money. But our present Chief Justice, in Collins v. State Treasurer, supra, 436, 439, 440, answered this when he said, 'But that which cannot be done directly the law will not permit to be accomplished by indirection, for such a course, when tolerated by the courts, only serves to bring the law into contempt...... The pruning knife of the law eliminates all such devices, and lays bare the realities of the situation, with which we must deal...... The state's money cannot be permitted to go through the agency of the hospital association......since it falls within the class to which that character of recognition is forbidden by the Constitution.' " As already stated, the majority opinion here reasserts the conclusions overruled in that paragraph.

It is true that we also said in the case last cited, that the Constitution was not intended to and did not prevent legislation in relief of the poor, but we added (page 457) that the words "poor laws and persons" cannot be enlarged to include those not embraced therein at the time of the adoption of the Constitution, and that any attempt so to do would but result in antagonism to article III, section 18, of the Constitution.

In the instant case, therefore, appellees are impaled on one or the other of the horns of this dilemma: If the Act of 1931 is a poor law it is not within the purview of the governor's proclamation, and hence violates article III, section 7, of the Constitution; if it is not a poor law then it violates article III, sections 3 and 18, of that instrument. In either event the judgment of the court below should be reversed.

Justices DREW and LINN concurred in this dissent.