266 P.2d 757

## STATE TAX COMMISSION v. PREECE.
### No. 8138.

Supreme Court of Utah.

Feb. 3, 1954.

6. Title 59-5-18, U.C.A.1953.

C. Preston Allen, Salt Lake City, John R. Rampton, Jr., Bountiful, Adam M. Duncan, Salt Lake City, for plaintiff.

E. Richard Callister, Jr., Atty. Gen., Ken Chamberlain and H. R. Waldo, Jr., Salt Lake City, for defendant.

1. State v. Scott, 105 Utah 31, 140 P.2d 929; State v. Tweed, 63 Utah 176, 224 P. 443.

CROCKETT, Justice.

We are asked to determine the constitutionality of a statute enacted by the 1953 Special Session of the Utah Legislature which raised the excise tax on cigarettes from 2¢ to 4¢ per pack and allocated the revenue derived therefrom to the Uniform School Fund.[1]

Pursuant to its duty of collecting such taxes, the Tax Commission requisitioned necessary stamps. The defendant, Sherman J. Preece, State Auditor, upon the advice of the Attorney General, wilfully refused to comply with the requisition. He contends that the act referred to was not within the purview of the agenda of the Special Session as presented by the Governor. This action was brought to compel the Auditor to comply with the plaintiff's request.

It is not open to question that unless such act was included within the subject matter presented to the Special Session by the Governor it would be invalid.[2] In support of his position that although the Governor recommended the adoption of a school financing program which would entail increased costs, that this neither expressly nor by necessary implication embraced the imposition of a tax on cigarettes, the Attorney General makes two contentions: First, that other means of meeting such

1. Chap. 34, 1st Sp.Session 1953—Amend. 59–18–4 and 10, U.C.A.1953.

2. State v. Scott, 105 Utah 31, 140 P.2d 929.

costs were available without the imposition of any new taxes by the State; and second, that any increased taxes resulting from the new financing program would be a property tax.

The parties hereto cite authorities representing widely divergent views: From the extreme on the one hand, that the subject matter must be restricted very narrowly within the confines of the Governor's words; to the opposite, that anything reasonably incidental to, or even apparently within the scope of the subject would be within the Governor's call. Exemplary of the first class of cases, which are relied on by the defendant, are: Smith v. Curran,[3] which held unconstitutional an act validating bonds not covered by sufficient popular vote, which had been enacted by a special session called by a message which included "validation of bonds issued by a municipality under *sufficient* popular vote". The Michigan Court, in the above case, said: "While the Governor, within the range of a 'subject,' may not restrict the Legislature, he has the authority to limit the subject according to his conception of the need for legislation." In State ex rel. National Conservation Exposition Co. v. Woollen[4] the Governor's call stated " * * * appropriations of the public monies as may be deemed necessary and proper to maintain the state's institutions, offices and departments." The

court struck down a legislative appropriation to a corporation for the purpose of presenting an exposition, on the grounds that the corporation was not a State Department or office and therefore not within the subject matter before the Special Session, the court observing: "The Governor has power, under the Constitution, to limit the subjects which they may consider, and in order to do this he may define the subject so as to make it broad or narrow, according to his conception of his public duty."

Another case of similar import which defendants point to as controlling in principle, is Sims v. Weldon,[5] wherein the basic facts, except the substance of the Governor's call, further detail of which will hereinafter be given, are very similar to those of our case. The Governor's proclamation made reference to the fact that "the financial distress of the public schools of the state has compelled me to convene you * * *." and expressly directed attention to income taxes and a severance tax. A tax imposed upon cigarettes and cigars was held not within the call.

Doubt is cast upon the soundness of the ruling in the Sims case just referred to by reason of the fact that the same jurisdiction in the later case of McCarroll v. Clyde Collins Liquors[6] went about as far to the opposite extreme of giving a liberal interpretation to the language of the message

3.  268 Mich. 366, 256 N.W. 453, 454.
4.  128 Tenn. 456, 161 S.W. 1006, 1015.
5.  165 Ark. 13, 263 S.W. 42, 46.
6.  198 Ark. 896, 132 S.W.2d 19, 22.

as any we have found. However, it should be noted that the call there referred to no specific tax, it simply stated the purpose of providing "additional facilities for tubercular patients * * * and to provide funds therefor"; an act levying excise taxes on liquor was upheld as within the call, under the broad rule that "the General Assembly may consider not only the legislation specifically mentioned * * * but such other legislation as may necessarily or incidentally arise out of that call * * *."

The rule just stated is urged by plaintiff in support of their argument that the Governor opened up the subject of school finance and methods of raising funds which includes taxation. Other cases cited by them are: Baldwin v. State:[7] The purpose stated was to reduce taxes, but instead the Legislature increased taxes; the act was upheld as within the purpose; Commonwealth ex rel. Schnader v. Liveright:[8] The message specified the enactment of unemployment relief, a bill granting relief to the poor was upheld as not outside the proclamation; and Timmer v. Talbot[9] in which the call related to rectifying difficulties encountered by Federal Loan Agencies in financing installment mortgages on *livestock and produce* which the Legislature used as a basis of a bill covering *all mortgages of goods and chattels*. In holding the bill within the purview of the proclamation the court said: "The guiding prin-ciple in sustaining legislation of a special session is that it be germane to, or within, the apparent scope of the subjects which have been designated as proper fields for legislation."

Perusal of the authorities touching upon the legislative prerogative under calls to special session leads to the conclusion that although the extreme cases either way seem to be irreconcilable, there is no disagreement as to the proposition that while the Legislature must confine itself to the subject matter submitted, it is not required to follow the views of the Governor as to the means it uses to accomplish the objectives stated in the subject set before them;[10] the conflict is not so much in the statement of the rule as it is as to whether a narrow or a broad interpretation will be given to the terms "subject matter" or "purpose" for which the special session is called.

The language of our constitutional provision is explicit—Sec. 6, Art. VII provides:

"On extraordinary occasions, the Governor may convene the Legislature by proclamation, in which shall be stated the purpose for which the Legislature is to be convened, and it shall transact no legislative business except that for which it was especially convened, or such other legislative business as the Governor may call to its attention while in session. * * *"

The interdiction "shall transact no legisla-

7. 21 Tex.App. 591, 3 S.W. 109.
8. 308 Pa. 35, 161 A. 697.

9. D.C., 13 F.Supp. 666, 668.
10. State v. Curran, see note 3, supra.

tive business except * * *" plainly evidences the intent that legislation should, in the main, be done at regular sessions and that special sessions are to be called only when there is some special need therefor and that matters considered should be limited to the essentials designated by the Governor. The reasons underlying such restriction undoubtedly were conservation of the time and effort of legislators and other state officials, considerations of economy, and that the public have notice of the legislation to be considered.[11]

In considering what was the *purpose* the Governor called to the attention of the Legislature, we must look to the entire context of his message, notwithstanding the fact that he expressly denied any desire that the State impose any new or higher taxes. In his letter announcing his intention to deliver it, he characterized the message as being " * * * on the subject of school retirement and finance"; and similarly in its first paragraph as "a message on the all important subjects of school retirement, finance and taxation"; and proceeding to the "specific proposals I have to make * * *", he recommended the enactment of certain previously prepared measures which would put into effect a program devised by the Legislative Council which increased the funds available under the state supported school finance plan. The detail is immaterial here except that under the prior law the amount ranged

from a minimum of $3,300 to a maximum of $4,290 per classroom unit, which was increased under the new law from minimum $3,450 to $4,530 maximum, depending on the amount provided by the districts. It is estimated that about one and one-half million dollars per annum will be needed from the State Uniform School Fund to meet the increase.

Realization by the Governor that it was up to the Legislature to find the means of providing this money seems clearly manifest. He not only called the subject to their attention but he made suggestions to them as how they should handle it as evidenced by the following expressions:

"Any discussion of further increase in finances, however, must be related to our present tax burden and what we can afford."

"The only way the increased levy on property can be postponed or avoided is to provide more money in the uniform school fund from other sources."

"As to the source of the funds, I recommend that they be obtained by borrowing from the appropriation of $2,157,000 that was made in the regular session to the school building fund. * * * The borrowing of $935,000 from the school building fund would not be out of order."

"The new plan proposes a ten mill local levy for a $3,450 per unit program graduated up to a 12 mill local

11. State v. Tweed, 63 Utah 176, 224 P. 443.

levy for a $4,050 program. This plan provides that any tax yield in excess of the minimum program for any district would revert to the [state] Uniform School Fund for distribution to the remaining school districts."

He also recommended the adoption of legislation by which the local districts would levy higher taxes resulting in more funds coming into the State Uniform School Fund; and further to a plan to allocate such funds to the districts on the basis of the increase of current year's enrollment over that of the previous year, with respect to which he stated: "A bill has been prepared based on these factors which will provide an additional $935,000 to eligible school districts for this year."

It seems clear that the Governor's objective was to avoid the imposition of any new state tax and to see that the added expense of the new program was supported from other sources, primarily by the local districts, as these comments show: "There are certain requisites to a changed financing law that will be met in my proposal including better equalization among the districts and greater local responsibility and control. It is essential that we increase local board responsibilities * * *, if we are ever to bring·taxing and spending into line. Those who decide on expenditure policies should bear the political responsibility for raising the necessary funds."

The Governor's suggestions as to the ways and means of handling the added cost of financing the schools may have been helpful and even desirable. However, we are in no wise concerned with the wisdom thereof, nor of the legislation which was actually passed, but only with whether the legislature acted within its constitutional powers in imposing a tax on cigarettes.

It cannot be disputed that the principal purpose of the Special Session was to relieve the condition of financial distress existing in our public school system. In attempting to do so, the Legislature, for the most part, adopted the proposals of the Legislative Council, which were also recommended by the Governor. However, they did not "borrow" the $935,000 from the school building reserve fund as he suggested; but rather took the sum of $1,525,000 from the mine occupation tax reserve fund. There is no suggestion that this deviation from the Governor's suggestion rendered that act invalid. And in order to provide additional needed funds, they passed the cigarette tax, which is here challenged.

We do not regard the question herein presented as being whether the Governor may limit the subject matter of his call by specifying a particular portion within a general subject without opening the entire subject to litigation. We do not disagree with the Attorney General's contention that he may do so, if he does so expressly, and if it does not result in infringing upon the

legislative prerogatives by attempting to dictate policy to them.[12]

We believe that the message here was of sufficient breadth that it presented the problem of school financing and the providing of funds therefor. Normally it is both the duty and responsibility of the Legislature to determine how this shall be done. We are then confronted with the question whether the Governor can call a Special Session to deal with the subject of financing our public schools, and by limiting the agenda to definite proposals as to how it shall be handled, formulate the policy with respect thereto. The answer to this proposition is found in the quite universally accepted rule, hereinbefore stated,[13] which we approve: That while the Governor may limit the legislative agenda as to the purpose or subject matter to be considered, he cannot restrict it as to the means it pursues in solving a problem presented as a subject for legislative action. It is true, of course, that the Governor may make such recommendations as he sees fit, but these are not binding on the Legislature; they may exercise their discretion in following the recommendations or seek alternative methods in dealing with the "subject" presented.

In further support of the conclusion reached herein it is pertinent to observe that the authorities on statutory construction, without exception, hold that if any doubt exists as to the constitutionality of a statute, such doubt should be resolved in favor of the act of the Legislature. Sutherland, in speaking of the constitutionality of measures passed by special sessions under constitutional provisions similar to our own says: "In determining whether the legislative action conforms to the Governor's call, the constitutional provisions should be strictly construed in favor of the legislative power, and a statute enacted during an extraordinary session should be presumed to be constitutional."[14] In State ex rel. National Conservation Exposition Co. v. Woollen [15] the court said: "It is agreed * * * that the presumption is always in favor of the constitutionality of an act, and that any piece of legislation so under consideration should be within the call, if it can be done by any reasonable construction."

We hold that passing the cigarette tax was within the purview of the subject matter presented to the Legislature by the Governor. The writ directing the auditor to have prepared and delivered the stamps requisitioned by the Tax Commission is granted.

McDONOUGH, J., and NORSETH, District Judge, concur.

12. Commonwealth ex rel. Schnader v. Liveright, see note 8, supra.

13. See note 10, supra.

14. Sutherland, Statutory Construction, 3d Ed., p. 118, Vol. 1.

15. See note 4, supra.

WOLFE, C. J., being disqualified, did not participate herein.

WADE, Justice.

I concur with the prevailing opinion but wish to call attention to the fact that the divergent opinions result from the difference in the approach to the problem. The prevailing opinion holds the Governor presented to the Legislature the problem of financing the additional school funds. The dissenting opinion contends that the Governor did not present to the Legislature the problem of financing these additional school funds by an increase of state levied taxes. Since the two opinions are discussing different subjects, it is not surprising that they end up with different conclusions. It would be almost impossible to call a special session to provide additional funds for the schools without presenting to the Legislature the problem of financing such project. Undoubtedly, the Governor intended to exclude from the consideration of the Legislature the levy of an additional tax on cigarettes by the state, but he proposed instead to borrow some of this additional fund from other departments of the state, and an additional local school district levy together with other methods of providing these funds.

Clearly it is the prerogative of the Governor to call special sessions of the Legislature and he can limit the problems which they may consider but he cannot limit them to the adoption only of his proposed solutions of such problems. If he possessed such power then he could legislate with the consent of the legislative bodies and they would be powerless to initiate anything contrary to his proposals. It is clear that the Governor did not intend to suggest this increased cigarette tax; he expressly stated that such was not his purpose. However, he did propose various other methods of raising these additional school funds. By such proposals he submitted to the Legislature the problem of financing the required additional school funds. Having submitted that problem to the Legislature he cannot limit the means or method by which it accomplishes that purpose or solves that problem. If he could do that, it would amount to legislation by the Governor with the consent of the Legislature.

HENRIOD, Justice.

I dissent, respectfully suggesting that the conclusion reached in the main opinion is not warranted by the specific or general language of the Governor's proclamation and messages to the Legislature at the special session.

The constitutional provision relating to special sessions is such that the Governor need not call a session at all, but that if he does the Legislature "shall transact *no* legislative business except that for which it was especially convened". It has a negative interdiction, and does not say the Legislature *may* pass legislation not included in the agenda. The negative char-

acter of the phraseology certainly indicates that the framers of the Constitution intended that the Governor should have plenary power to place matters before the Legislature in any restrictive way he chooses. How could a Governor more clearly limit the Legislature from considering a tax such as was imposed here on cigarettes (which is a "new and higher tax"), than by saying in clear, unmistakable language that "I am not here to propose new or higher taxes *to finance* the school program." The majority opinion has failed to lend significance to what the writer considers as being highly significant words of crystal clarity. On the other hand, after examination of thousands upon thousands of words contained in the proclamation and the numerous messages of the Governor, it has emphasized only a few scattered phrases that are either explanatory, not interdictive, or which, upon careful analysis, do not negative, but actually support the statement that "I am not here to propose new or higher taxes to finance the school program." These phrases will be referred to later on.

How more clearly could a Governor express an intention not to place the subject of this cigarette tax on the agenda than by saying, as he did in his veto message, "My contention in vetoing this bill, is that specific tax matters are not properly before the Legislature and therefore this bill is null and void." Again, the majority opinion apparently has deemed unimportant these equally significant words, a part of this rec-

ord. Is is not reasonable to believe that the framers of the Constitution had a case like this in mind when they gave the Governor the right to place before the Legislature only those matters upon which he expressly invites it to deliberate, not those which he unequivocally negates, when they said the Legislature "shall transact *no* legislative business except that for which it was especially convened"?

The writer subscribes to the principle enunciated in the main opinion that doubts should be resolved in favor of the constitutionality of acts of special sessions, but the converse is true, that if the executive uses language which is not doubtful, an act in derogation thereof should be favored just as emphatically by unconstitutionality. I am of the opinion that this case comes within the latter category.

The majority opinion also has said that a statute passed at a special session is presumed to be constitutional. With that I agree, but like most presumptions, that of constitutionality may be rebutted, and once having been rebutted, disappears. Could the presumption here be more strongly rebutted than by the unambiguous words of the executive when he said "I am not here to propose new or higher taxes to finance the school problem"?

Nowhere in the majority opinion can be found any defense for the principle that the expressed intention of the Governor in building an agenda for a special session should be the highest and most respected

346

probative evidence in determining what that agenda is. And yet the majority opinion either deems that expressed intention unimportant or simply and arbitrarily concludes that when the executive says "I am not here to propose new or higher taxes," he meant to say "I am here to propose a new and higher tax, cigarette or otherwise." With deference to the main opinion, it reasons that when the Governor uses phrases referring to "financing," he must have meant that to include new and higher taxes, since financing of state agencies at least customarily is financed in part by taxes. But this conclusion lends itself to no form of syllogistic reasoning. After reading the thousands of words given to the Legislature by the Governor, and following the admonition of the majority that "we must look to the entire context of his messages" to find the purpose of his call, no doubt existed in the writer's mind that it was, "not to propose new or higher taxes," but to ask the Legislature to relieve the school fund by allocating to that fund existing state funds represented by a number of presently available sources. It is arguable that in recommending a bill which had the effect of increasing the minimum amount per class room unit from $3,300 to $3,450, there could be no escape from an increased tax burden, but the record fairly indicates that there were ample available state funds that could have satisfied the increased amount needed for the current year and until the Legislature met the following January in regular session.

Moreover, should it be assumed that the increased amount per class room unit would entail "higher" taxes (and we cannot indulge in such assumption), nevertheless, being a property tax, it was not a "new" tax as is the excise tax here involved. I cannot see how a request to allocate moneys presently available can be interpreted as an invitation to levy "new and higher" taxes on cigarettes in the future. It is no answer to say he mentioned several sources of possible funds and that having mentioned that the funds would have to come from some source, the field of taxation was opened up, since that is a "source." Such contention fails of logic.

Throughout the various messages, (which are public documents, and to which the reader is referred since their length makes incorporation here impractical), there is a pattern of language showing clearly that the chief executive did not intend an agenda calling for passage of a statute imposing taxes on cigarettes or any other commodity. He said at one point, for example, that "I did not feel then, *nor do I feel now* that I could or can recommend higher taxes * * *." Again: "Any discussion of further increases in finances, however, *must be related to our present tax burden and to what we can afford.*" Again: "It goes without saying that *I am opposed to any increase in taxes, unless the people themselves vote* to impose them." All of which indicates his intention was to relieve the schools with present existing funds.

At the expense of protraction, I feel I should attempt to point out what I believe to be weaknesses of the majority opinion. A major portion of the main opinion is devoted to general principles and review of cases. I have no quarrel with the principles stated, although they are principles that place the majority's conclusion in the most favorable light, to the exclusion of principles that would justify the veto and interpret the proclamation in a light most favorable to exclusion of the tax from the agenda. So far as the authorities cited in the opinion, and in the briefs are concerned, they are in hopeless confusion, and none is very helpful since every case of the type we have here must be decided upon its own peculiar facts. So far as they may be pertinent at all in helping us to decide the matter, the majority opinion leans more heavily on those favoring its position. I respectfully suggest that the authorities which the main opinion refuses to follow are superior in reasoning and numerosity than those it follows, and should govern here. Typical of the cases followed by the majority is Baldwin v. State, where the Governor called the Legislature for the specific purpose of *reducing* taxes, and the agenda was held to be such that the Legislature actually could *raise* taxes. Although the case does not appeal to the writer's logic, and surely would not appeal to the reasoning of the average intelligent taxpayer, it can be justified on circuitous grounds. On the other hand, a case which the majority opinion chooses to reject, factually comes closest to our instant case. In Sims v. Weldon, 165 Ark. 13, 263 S.W. 42, 47, the Governor stated that "the financial distress of the public schools * * * has impelled me to convene you * * *." He expressly mentioned income taxes and a severance tax as being sources. Nevertheless, the Legislature passed a tax on cigarettes. The statute was adjudged unconstitutional, the subject matter not having been on the agenda. This case was cited favorably in a later case, with different facts and with a different result, McCarroll v. Clyde Collins Liquors, and it is suggested that the main opinion's effort to minimize the Sims case by pointing to the McCarroll case and its different *result,* is not warranted by the facts or the result.

The defendant has presented a goodly number of respected authorities that even though a Governor designates a general subject in his call he may restrict the agenda to a branch or portion or phase thereof without placing the whole subject on the agenda. Although the majority opinion apparently neither espouses nor rejects these authorities and the principle they enunciate, the writer urges that these authorities represent the common sense approach and should control the instant case. Certainly they are apropos in a state like Utah, whose constitution clearly gives the Governor plenary power to present only what he chooses, and which contains a negative interdiction that the Legislature "shall transact *no* legislative business except that for which it was especially convened", and

where the executive said "I am not here to propose new or higher taxes," and where he clearly reiterated his stand by vetoing the bill for the specific reason that it was not in the agenda.

It should be fundamental and elementary that where a chief executive has made a clear and unmistakable statement that he was not placing a subject on the agenda, any departure from such expressed intention, should, as in many civil actions, be proved by clear and convincing evidence. No such clear and convincing evidence is shown either in the majority opinion or anywhere in the record itself. Although the main opinion says we must look at the whole context of the messages to determine the purpose of the call and the agenda given, it has made reference only to a few scattered remarks, proving nothing either clearly or convincingly, but which actually are quite consistent with the statement that "I am not here to propose new or higher taxes," and quite inconsistent with the idea that a tax imposed on cigarettes was on the agenda in this case. Let us examine the prevailing opinion a little more closely:

Counsel, made a point of the fact that the Governor announced that this was "a message to * * * the Legislature on the subject of school retirement and finance." This quotation is quite consistent with the Governor's expressed intention not to put new or higher taxes on the agenda. It is wholly consistent with the general theme throughout the messages, that the financing, though imperative, was to be accomplished with *existing* funds, *not* new taxes. The same is true of the statement of the Governor, that he was giving a "message on the all important subjects of school retirement, finance and taxation". It cannot be assumed that his reference to taxation indicated that he intended that the Legislature should levy new or higher taxes. In the same document and later on, the Governor said just the opposite, when he said "I am not here to propose any new or higher taxes." The assumption is that his reference to taxation in the introduction was in the light of what followed, and that so far as taxation was concerned, state level new or higher taxes were not on the agenda.

The main opinion says the Governor realized that it was up to the Legislature to find the funds. I cannot say what the Governor realized, but assuming he did, there is nothing in such realization that is inconsistent with an agenda calling for financing with existing funds to the exclusion of new or higher taxes. The prevailing opinion then points to 3 suggestions made by the Governor how the Legislature could handle the problem. They quote him:

(1) "Any discussion of further increase in finances, however, *must be related to our present tax burden* and what we can afford." Rather than being indicative of placing new or higher taxes on the agenda,

the quoted language obviously negatives such a concept when the financing must be related to our *present* tax burden,—not to *future* new or higher taxes.

(2) "The only way the increased levy on property can be *postponed or avoided* is to provide more money in the uniform school fund from other sources." This statement of the Governor, made in the same document where he says no new or higher taxes, can, by no stretch of the imagination, be construed to be an invitation to levy new or higher taxes, and it is not at all inconsistent with the expressed intention not to put a tax like the one involved here on the agenda. Rather, by pointing out that the property levy could be postponed only by getting money from other sources, the Governor certainly indicated that he intended that there be no property levy, but that the increased cost was to be borne by presently available state funds, not new taxes. Hence the majority opinion can get little comfort for its conclusion from this suggestion by the Governor.

(3) "As to the source of the funds, I recommend that they be obtained by borrowing from the appropriation * * * made in the *regular* session to the school building fund." Here again any idea that taxes were on the agenda is negatived by the language itself. "Borrowing" certainly is not synonymous with "taxing." It is the antithesis.

Counsel for plaintiffs pointed out that the executive referred to plans for local tax levies. It must be remembered that in the same paragraph and in the sentence preceding his statement that "I am not here to propose new or higher taxes," he said "It goes without saying that I am opposed to any increase in taxes, *unless the people themselves vote to impose them.*" Certainly such language clearly expresses an intention not to put new state-level taxes on the agenda. Certainly when a person says he favors *the people* voting for any new taxes, he is not stating that he intends that the *Legislature* should vote for them. The clear language negativing such procedure completely destroys any implication that the field of new and higher taxes has been either intended or submitted to the Legislature.

And now, calling attention to other language of the main opinion, the writer suggests that it supports completely the position of this dissent, when it says: *"It seems clear that the Governor's objective was to avoid the imposition of any new state tax and see that the added expense of the new program was [to be] supported from other sources".* Then, after stating the Governor's suggestions might be helpful and desirable, the prevailing opinion says we are not concerned with the wisdom of such suggestions or the statute enacted but only with the latter's consitutionality. With such observation, I concur,—*but that is the whole case,* and stating the proposition is but an ipse dixit, having no probative value as to whether the Gov-

ernor did or did not mean to withhold new and higher taxes from the agenda.

There follows in the main opinion several observations and generalities as to what the Legislature did. It is not important what the Legislature did, if the Governor *did not* put the subject of its action on the agenda. The main opinion says we are confronted with the question as to whether the Governor can call a session to deal with a subject and by limiting the agenda to definite proposals as to how it shall be handled, formulate policy with respect to the financing of our public schools. We are not confronted with any such thing. We are confronted with the question whether the Governor, by express language, put a subject on the agenda, regardless of any attempt, by word or action, to formulate policy.

The prevailing opinion concludes that "We believe that the message here was of sufficient breadth that it presented the *problem of school financing and the providing of funds therefor.*" This conclusion does not decide the issue, which is whether the Governor placed· on the agenda the matter of finances, *and whether having done so, he placed on the agenda the matter of taxation as a means of such financing.*

The court in its conclusion makes "financing" as it applies to state agencies, synonymous with "taxing." It is a dangerous precedent, because it is impossible to imagine a case where an agenda could be given to the Legislature, the subject matter of which requires no financing. After this decision no Governor can call a special session without opening up the field of taxation generally. Future Governors who do not desire the matter of increased taxation considered by the Legislature, may hesitate to call special sessions, even though an emergency may exist. In deciding as we have, we have deserted and emasculated the constitutional provision allowing for the calling of special sessions, so far as permitting a governor to control any deliberation as to the important matter of taxation.

As a practical matter, the main opinion (1) will serve as a deterrent in the calling of special sessions, even where sorely needed, (2) destroys the constitutional provision on special sessions so far as it pertains to taxation as subject matter on an agenda, (3) invades the realm of the executive branch, since our decision tells the executive that he does not mean what he clearly says, (4) permits expansion of the questionable and possibly dangerous practice of earmarking taxpayers' funds, (5) opens the door to bootlegging with its attendant and increasing disrespect for our laws, and (6) actually results in a net tax loss in an amount exactly equal to the amount that is represented by the number of bootlegged packages of cigarettes multiplied by 4¢.